Gregory G. Hesse, Esq.
State Bar No. 09549419
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202-2799
Telephone: (214) 979-3000
Telecopy: (214) 880-0011

***Attorney for Space Exploration Technologies Corp.***

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **In Re:** | § | |
| | § | **Case No. 26-50660-ALT** |
| **ALPHA BUILDING CORPORATION,** | § | |
| | § | |
| **Debtor.** | § | **Chapter 7** |

**OBJECTION TO NO-ASSET REPORT AND REPORT OF ABANDONMENT**

Space Exploration Technologies Corp. ("***SpaceX***") respectfully states the following in support of this objection (this "***Objection***") to the *No-Asset Report and Report of Abandonment* filed by Randolph N. Osherow (the "***Chapter 7 Trustee***") on July 13, 2026 [Docket No. 15] (the "***Report***").

**PRELIMINARY STATEMENT**

1. The Report should not be given effect because the present record reflects potentially valuable estate causes of action against Omega (defined below) and Jonathan K. Rogero. In particular, Alpha Building Corporation's (the "***Debtor***" or "***Alpha***") own books and records, together with facts developed at the section 341 meeting of creditors (the "***341 Meeting***"), support a colorable insider preference claim against Omega of at least $1,739,000 and a separate potential insider preference claim against Rogero arising from a direct $60,000 transfer to him on August 20, 2025. In the alternative, to the extent that Omega and Rogero are not creditors, there are colorable fraudulent transfer claims that could be avoided for the benefit of the estate.

2. As such, further administration is warranted before the estate may properly be treated as fully administered and before potentially valuable causes of action may be abandoned. Alternatively, if the Court permits abandonment, SpaceX respectfully requests clarification that nothing in any abandonment order prohibits creditors from pursuing whatever direct rights and remedies they may have under applicable nonbankruptcy law, including, but not limited to, any rights to prosecute claims under the Texas version of the Uniform Fraudulent Transfer Act. See, Tex.. Bus. & Comm. Code § 24.001, et. seq.

## BACKGROUND

### A. The Bankruptcy Case

3. On March 14, 2026 (the "***Petition Date***"), Alpha filed a voluntary petition (the "***Petition***") for relief under chapter 7 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Western District of Texas (the "***Court***").

4. The Petition and accompanying schedules and statements were executed by Jonathan K. Rogero in his capacity as President of Alpha. In its Petition, Alpha represented that, after payment of administrative expenses, no funds would be available for distribution to unsecured creditors.

5. On March 16, 2026, the clerk filed the *Notice of Chapter 7 Bankruptcy Case—No Proof of Claim Deadline* [Docket No. 3], pursuant to which Randolph N. Osherow was appointed the Chapter 7 Trustee, and the 341 Meeting was scheduled for April 30, 2026.

6. The 341 Meeting was held over multiple settings and was ultimately concluded on June 19, 2026.

7. Thereafter, on July 13, 2026, the Chapter 7 Trustee filed the Report.

**B. Alpha and Omega**

8. Alpha is a Texas business entity that operated as a construction contractor. At the 341 Meeting, Rogero testified that he owned approximately 72% of Alpha, served as its president, and operated Alpha from 121 Interpark Blvd., Suite 200, San Antonio, Texas.

9. Omega GC LLC ("***Omega***") is a Texas limited liability company formed on March 13, 2023, with a delayed effective date of March 14, 2023. At the time of its formation, Omega's address was 24850 Blanco Road, Suite 105, San Antonio, Texas 78260.

10. Omega's certificate of formation identifies Jonathan Rogero as its registered agent and managing member, and the 2024 Texas Franchise Tax Public Information Report identifies Jonathan Rogero as Omega's managing member.

11. At the 341 Meeting, Rogero testified that Omega also operated as a construction contractor, that he owned 100% of Omega, served as Omega's president, and operated Omega from the same 121 Interpark Blvd., Suite 200 location as Alpha. Rogero also testified that Omega had a sublease from Alpha, which Alpha did not disclose in its schedules.

C. **SpaceX's Prepetition Relationship with Alpha**

12. Prior to the Petition Date, SpaceX contracted with Alpha as general contractor for SpaceX construction projects in South Texas (the "***Projects***").

13. The Projects experienced delays, performance issues, and subcontractor-payment disputes, resulting in SpaceX and Alpha litigating the disputes in an arbitration proceeding (the "***Arbitration***"). At the conclusion of the Arbitration, the arbitrator entered a substantial, confidential award in favor of Alpha.

14. During the same period, Alpha's failure to pay subcontractors in connection with the Projects resulted in liens, claims, and related disputes involving SpaceX's property. As a result,

subcontractors and other downstream claimants looked to SpaceX for payment, and SpaceX entered into settlements resolving at least some of those claims. As part of those settlements, certain settling subcontractors and claimants assigned to SpaceX their claims, rights to payment, and causes of action against Alpha.

15. Additionally, in its schedules, Alpha listed a number of subcontractors as creditors with claims arising from the Projects.

**D. Alpha Transfers to Omega and Rogero**

16. On August 20, 2025, Alpha received a deposit of $2,463,586.51 (the "***August 20 Deposit***") into an account at MidFirst Bank ending in 7139 ("***Account 7139***"). Alpha immediately began transferring out the August 20 Deposit. Indeed, on the same day that it received the August 20 Deposit, Alpha transferred from Account 7139: (a) $60,000 directly to Jonathan Rogero and (b) $435,000 to Omega, including $235,000 to an account ending in 7171 ("***Account 7171***"), and $100,000 each to accounts ending in 5459 and 3752 ("***Account 5459***" and "***Account 3752***," respectively).

17. The August 20, 2025 transfers were not isolated. Alpha made additional transfers from Account 7139 to Account 7171 on August 21, August 26, and August 27, 2025, and continued making transfers to that same account in September and October 2025. In total, Alpha transferred at least $1,539,000 to Account 7171 between August 20, 2025 and October 3, 2025, in addition to the August 20, 2025 transfers of $100,000 to Account 5459 and $100,000 to Account 3752. Copies of the bank statements for Account 7139 for the months of August, September and October 2025 are attached hereto as **Exhibit A.**

18. Alpha's general ledger reflects that transfers out of Alpha's account were repeatedly booked to intercompany accounts bearing the narrative "Due to Due From

Omega/Alpha," including entries referencing "Omega 7171" and "Omega 5459." Those ledger entries are consistent with Rogero's testimony that Omega had been advancing money to Alpha and that the later transfers reduced Alpha's indebtedness to Omega.

19. A copy of Alpha's General Ledger for the dates from January 1, 2023 through April 30, 2026 is attached hereto as **Exhibit B**.

**E. Facts Developed at the 341 Meeting and the Trustee's Decision to File the Report**

20. Rogero appeared and testified on behalf of Alpha at the 341 Meeting.

21. At the 341 Meeting, Rogero confirmed the ownership and management overlap between Alpha and Omega, Alpha's wind-down, Omega's advances to Alpha, and Alpha's use of the August 20 Deposit to make transfers to Omega-related accounts. Rogero testified that the post-deposit transfers reduced Alpha's intercompany debt as reflected on the general ledger.

22. Rogero separately acknowledged that Alpha made a $60,000 transfer directly to him on August 20, 2025, and stated that the payment was for back pay and reimbursement of expenses. Therefore, it appears that Rogero was a creditor of Alpha and that the transfer was made on account of antecedent obligations.

23. Before the filing of the Report, SpaceX and the Chapter 7 Trustee discussed potential estate causes of action against Omega and Rogero. In the course of those discussions, the Chapter 7 Trustee proposed a sale of those causes of action and invited an offer in excess of $45,000 and later offered a final sale price of $50,000. SpaceX responded with a counterproposal under which it would advance expenses associated with pursuing the claims and share any proceeds from the preference claims; however, the Trustee refused to agree to that agreement. The Trustee has offered no reason why it would not allow SpaceX to pursue the preference claims on this basis or why it would be better for the estate to abandon the claims altogether.

24. Thereafter, on July 13, 2026, the Chapter 7 Trustee filed his Report, stating that he had made a diligent inquiry into the Debtor's financial affairs and that the estate had been fully administered, while listing the abandoned property as "N/A" and the reason the property had no value to the estate as "N/A."

25. Despite the filing of the Report, the facts elicited at the 341 Meeting and reflected in the Debtor's own books and records support SpaceX's position that the estate holds potentially valuable claims against Omega and Rogero that should not be abandoned through the Report.

## **OBJECTION**

### A. Governing Legal Standards

26. Section 554(a) of the Bankruptcy Code permits a chapter 7 trustee to abandon property of the estate if such property is burdensome to the estate or is of inconsequential value and benefit to the estate. 11 U.S.C. § 554(a).

27. A trustee's decision to abandon property is reviewed under the business judgment standard. In a contested abandonment the relevant inquiry is whether the trustee made a business judgment, in good faith, upon some reasonable basis, and within the scope of the trustee's authority. *In re Fulton*, 162 B.R. 539, 540 (Bankr. W.D. Mo. 1993); *In re Slack*, 290 B.R. 282, 284 (Bankr. D.N.J. 2003); *In re Blasingame*, 598 B.R. 864, 872 (B.A.P. 6th Cir. 2019).

28. Although courts generally defer to the trustee's judgment, that discretion is not unlimited. Courts place the burden on the party opposing abandonment to prove a benefit to the estate and an abuse of the trustee's discretion, and the objecting party must show some likely benefit to the estate. *In re Slack*, 290 B.R. at 284; *In re Blasingame*, 598 B.R. at 872.

29. These same principles apply where the property at issue consists of causes of action, as causes of action are themselves property of the estate. *In re Blasingame*, 598 B.R. at 870–71.

30. Section 547(b) of the Bankruptcy Code authorizes avoidance of certain prepetition transfers of an interest of the debtor in property made to or for the benefit of a creditor, on account of an antecedent debt, while the debtor was insolvent, within the applicable preference period, and that enabled the transferee to receive more than it would receive in a chapter 7 liquidation if the transfer had not been made. *Matter of Southmark Corp.*, 993 F.2d 117, 119 (5th Cir. 1993).

31. The statute extends the lookback period from ninety days to one year before the petition date where the transfer was made between ninety days and one year before the petition date and the creditor at the time of the transfer was an insider. 11 U.S.C. § 547(b)(4)(B); *Matter of Southmark Corp.*, 993 F.2d at 119; *In re Think3, Inc.*, 529 B.R. 147, 189–92 (Bankr. W.D. Tex. 2015).

32. Courts also recognize that insider status may be either statutory or non-statutory. 11 U.S.C. § 101(31); *In re Think3, Inc.*, 529 B.R. 147, 189–92 (Bankr. W.D. Tex. 2015). To the extent insider status is asserted on a non-statutory basis, the analysis turns principally on the closeness of the relationship between the transferee and the debtor and whether the transactions were conducted at arm's length. *See In re Senior Care Ctrs., LLC*, No. 18-33967-sgj11, Adv. No. 20-03182-sgj, 2023 WL 6519756, at 23 (Bankr. N.D. Tex. Mar. 22, 2023).

33. The one-year preference period is not merely a procedural extension of the ordinary ninety-day period. Rather, it applies only where the transfer was made between ninety days and one year before the petition date and the creditor at the time of the transfer was an insider, and, in the Fifth Circuit, the insider must be a creditor in connection with the antecedent debt underlying the transfer. *Matter of Southmark Corp.*, 993 F.2d 117, 119–20 (5th Cir. 1993); *Matter of T.B. Westex Foods, Inc.*, 950 F.2d 1187, 1190 (5th Cir. 1992).

34. Accordingly, where the record reflects a reasonable basis to believe that the debtor made transfers to an insider, or on account of insider-related antecedent debt, within one year before the petition date, those potential avoidance claims constitute estate property and may not be abandoned on a conclusory record that fails to identify the property at issue or explain why it lacks value to the estate. *In re Blasingame*, 598 B.R. at 870–73; *In re Fulton*, 162 B.R. at 540.

**B. The Record Reflects Colorable Preference Claims Against Omega and Rogero**

35. The record here supports each of the elements of a preference claim under section 547(b), at least to the extent necessary to show that further administration is warranted and that abandonment is improper on the conclusory "N/A" record reflected in the Report.

***a. Omega and Rogero Are Insiders of Alpha***

36. Omega and Rogero are insiders of Alpha. Rogero testified that he owned approximately 72% of Alpha, served as its president, and operated Alpha from 121 Interpark Blvd., Suite 200, San Antonio, Texas. Rogero also testified that he owned 100% of Omega, served as Omega's president, and operated Omega from that same location. Omega also had a sublease from Alpha that Alpha failed to disclose in its schedules.

37. Those facts support insider status for Rogero directly, as Alpha's president and controlling equity holder. They also support insider status for Omega, whether as a statutory insider, an affiliate-based insider, or a non-statutory insider. The Bankruptcy Code's definition of "insider" is non-exclusive and, in the case of a corporate debtor, includes officers, persons in control, and an affiliate, or insider of an affiliate, as if such affiliate were the debtor. 11 U.S.C. § 101(31).

38. The Bankruptcy Code further defines "affiliate" to include "a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled,

or held with the power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with the power to vote, 20 percent or more of the outstanding voting securities of the debtor." 11 U.S.C. § 101(2)(B). As this Court has explained, that provision describes both vertical and horizontal affiliation relationships. *In re Arete Healthcare LLC*, No. 19-52578-cag, Adv. No. 21-05079-cag, 2022 WL 362924, at 5–7 (Bankr. W.D. Tex. Feb. 7, 2022).

39. Given Rogero's ownership and control of both Alpha and Omega, as well as the shared address and intertwined operations, Omega is an insider of Alpha.

***b. Alpha Made Transfers of Its Property to Omega and Rogero***

40. The transfers at issue were transfers of Alpha's property. Alpha received the August 20 Deposit on August 20, 2025.

41. On that same day, Alpha transferred $60,000 to Rogero and $435,000 to Omega, including $235,000 to its Account 7171, $100,000 to Account 5459 and $100,000 to Account 3752. Alpha then made additional transfers to Account 7171 on August 21, August 26, and August 27, 2025, and continued similar transfers into September and October 2025. These transfers were made from Alpha's own account and are reflected in Alpha's own books and records.

42. In total, the record reflects at least $1,539,000 transferred to Omega's Account 7171, plus $100,000 to Omega's Account 5459 and $100,000 to Omega's Account 3752, in addition to the $60,000 direct payment to Rogero. The funds transferred were therefore property of Alpha, and the transfer element is plainly satisfied for purposes of showing a colorable estate claim.

***c. The Transfers Were Made To or For the Benefit of Apparent Creditors***

43. Omega and Rogero appear to have been creditors of Alpha. As Alpha's general ledger reflects and Rogero's testimony at the 341 Meeting confirmed, Omega had advanced funds to Alpha as Alpha's cash flow declined, Alpha's debt to Omega peaked at approximately $1.7 million in August 2025, and that Alpha still owed Omega approximately $230,000 as of the Petition Date. Rogero likewise testified that the transfers from Alpha reduced Alpha's intercompany debt to Omega. That general ledger and testimony establishes, at minimum, that Omega appears to have been a creditor on account of intercompany advances.

44. As to Rogero, he testified that the $60,000 transfer to him was for back pay and reimbursement of expenses. A claim for unpaid compensation or unreimbursed expenses would make it appear that the recipient was a creditor of the debtor. Thus, the record supports that Rogero, too, appears to have been a creditor of Alpha at the time of the transfer.

***d. The Transfers Were on Account of Antecedent Debt***

45. The antecedent-debt element is also well supported. Here, Rogero testified that Omega had been advancing funds to Alpha as Alpha's business deteriorated and that the debt to Omega reached approximately $1.7 million in August 2025 before being reduced by the challenged transfers.

46. Alpha's general ledger corroborates that testimony by repeatedly booking transfers to intercompany accounts described as "Due to Due From Omega/Alpha," including references to "Omega 7171" and "Omega 5459." Those books and records support the conclusion that Alpha transferred funds on account of preexisting intercompany obligations to Omega.

47. Likewise, Rogero's testimony that the $60,000 payment was for "back pay and reimbursement of expenses" supports the conclusion that the transfer to him was made on account of antecedent obligations already owed by Alpha before the payment was made.

***e. Alpha Was Insolvent When the Transfers Were Made***

48. The record also supports insolvency. Although section 547(f)'s presumption applies only during the ninety days preceding the petition date, insolvency may be established through surrounding facts and reasonable inferences. Here, Rogero testified at the 341 Meeting that Alpha began winding down in or around May 2024, laid off all employees other than Rogero, and relied on advances from Omega as Alpha's cash flow declined. Alpha's inability to pay subcontractors led to liens, claims, and related disputes. Alpha eventually filed a chapter 7 case and represented in its petition that no funds would be available for unsecured creditors after payment of administrative expenses.

49. Those facts support a reasonable inference that Alpha was insolvent in August through October 2025 when it transferred the August 20 Deposit to Omega-related accounts and to Rogero. At minimum, they show that insolvency is a real and litigable issue supporting further administration rather than abandonment.

***f. The Transfers Were Made Within the One-Year Insider Preference Period***

*50.* The petition date is March 14, 2026. The challenged transfers were made beginning on August 20, 2025 and continuing through October 3, 2025. Those transfers therefore occurred between ninety days and one year before the petition date. Because Omega and Rogero were insiders, the one-year reach-back period under section 547(b)(4)(B) applies, assuming they are found to have been creditors at the time of the transfers within the meaning of section 547(b).

***g. The Transfers Enabled Omega and Rogero To Receive More Than They Would Receive in a Chapter 7 Case***

51. The record further supports the final preference element. Alpha filed a chapter 7 case and represented that there would be no distribution to unsecured creditors after payment of

administrative expenses. If Omega and Rogero had not received the challenged prepetition payments and instead were left to share in a chapter 7 distribution on account of their apparent claims, the record indicates they would have received less than the payments they actually obtained.

52. The immediate payment of large sums from the August 20 Deposit allowed Omega and Rogero to recover on account of their apparent claims ahead of other creditors and outside the chapter 7 distribution scheme. On this record, that satisfies—or at minimum strongly supports—the "greater than chapter 7" element of section 547(b).

#### *h. The Omega and Rogero Preference Claims Are Potentially Valuable Estate Property*

53. The potential value of these claims is not speculative. The transfers to Omega-related accounts total at least $1,739,000, and the direct transfer to Rogero adds another $60,000. Those amounts are substantial by any measure and far exceed the threshold necessary to demonstrate likely benefit to the estate.

54. The Court need not adjudicate the ultimate merits of those claims now. The present issue is narrower: whether the estate may be closed and potentially valuable causes of action abandoned based on a report that identifies the abandoned property as "N/A" and gives the reason for lack of value as "N/A," despite a record showing colorable insider preference claims supported by the Debtor's general ledger and sworn 341 testimony. It may not.

#### *i. In the Alternative, There Are Valuable Fraudulent Transfer Claims Which Could Provide Value to the Estate*

55. In the alternative, if it is determined that Omega and Rogero were not creditors of Alpha at the time of the transfers, the same transfers support colorable fraudulent-transfer claims under both the Texas Uniform Fraudulent Transfer Act ("***TUFTA***") and section 548 of the

Bankruptcy Code. A trustee may pursue TUFTA-based claims through section 544(b), and the Bankruptcy Code separately permits avoidance of certain actual and constructive fraudulent transfers under section 548. *See In re Pace*, 456 B.R. 253, 266 (Bankr. W.D. Tex. 2011); *In re Strange*, 664 B.R. 143, 155–56 (Bankr. W.D. Tex. 2024); *In re Think3, Inc., 529 B.R. 147, 196–201 (Bankr. W.D. Tex. 2015)*.

56. Under TUFTA, fraudulent transfers include both actual fraudulent transfers and constructive fraudulent transfers. *See In re Pace*, 456 B.R. at 266; *In re Strange*, 664 B.R. at 155–56. A constructively fraudulent transfer requires proof that the debtor transferred an interest in property without receiving reasonably equivalent value and while insolvent or rendered insolvent by the transfer. *See In re Strange*, 664 B.R. at 147, 162; *In re Pace*, 456 B.R. at 266–67. For actual fraud, courts may infer intent from TUFTA's badges of fraud, including whether the transfer was to an insider, whether the debtor had been sued or threatened with suit, whether the debtor was insolvent or became insolvent shortly after the transfer, and whether the debtor received reasonably equivalent value. *See In re Strange*, 664 B.R. at 157–60; *In re Pace*, 456 B.R. at 266–68. Section 548 likewise recognizes both actual fraudulent transfer and constructive fraudulent transfer theories. *See Think3*, 529 B.R. at 196–201.

57. Here, the same facts that support the preference analysis also support a substantial fraudulent-transfer alternative. The record reflects insider relationships, Alpha's financial distress, pending or threatened claims, and transfers of substantial funds under circumstances that at minimum warrant examination of reasonably equivalent value and insolvency. *See In re Pace*, 456 B.R. at 266–68; *In re Strange*, 664 B.R. at 157–62; *Think3*, 529 B.R. at 196–201. Accordingly, even if Omega and Rogero are ultimately found not to have been creditors, the estate still appears

to hold colorable TUFTA-based and section 548 fraudulent-transfer claims that could provide value to creditors and therefore should not be abandoned on the present record.

***j. The Report Does Not Supply a Sufficient Basis for Abandonment***

58. Here, the Report does not identify any specific cause of action, transfer, or category of property that the Chapter 7 Trustee evaluated and determined to be burdensome or of inconsequential value to the estate. Instead, the Report states that the estate has been fully administered, lists the abandoned property as "N/A," and lists the reason the property had no value as "N/A."

59. That is not enough on this record. SpaceX has identified concrete transfers, a specific insider relationship, evidence of antecedent debt, evidence supporting insolvency, and a plausible greater-than-chapter-7 recovery theory. The Trustee previously recognized the existence of these causes of action when he proposed a sale process and requested an offer exceeding $45,000. Having acknowledged those claims, the Trustee cannot support abandonment through a conclusory report that provides no property-specific analysis at all.

60. Accordingly, the Report should not be given effect to abandon the estate's potential claims against Omega and Rogero, and further administration is warranted before the estate may properly be treated as fully administered.

**WHEREFORE, PREMISES CONSIDERED,** SpaceX respectfully requests that the Court (a) enter an order substantially in the form of the proposed order attached hereto as **Exhibit C**; (b) in the alternative, if the Court permits abandonment, provide that any resulting order make clear that such abandonment does not bar creditors from pursuing any direct claims or remedies available under applicable nonbankruptcy law, including, but not limited to, causes of action under

the Uniform Fraudulent Transfer Act as codified in Texas; and (c) grant such other and further relief to which it may be justly entitled.

Dated: July 27, 2026

Respectfully submitted,

/s/ *Gregory G. Hesse*

Gregory G. Hesse (TX Bar No. 09549419)
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, TX 75202
Telephone: (214) 979-3000
Email: ghesse@hunton.com

*Counsel for Space Exploration Technologies Corp.*

**CERTIFICATE OF SERVICE**

I certify that on July 27, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Western District of Texas on those parties registered to receive electronic notices.

*/s/ Gregory G. Hesse*
Gregory G. Hesse